1 | SEAN P. REIS (SBN 184044)
sreis@reisfirm.com
2 | THE REIS LAW FIRM, A.P.C.
30021 Tomas Street, Suite 300
3 | Rancho Santa Margarita, California 92688
Telephone: (714) 352-5200
4 | Facsimile: (714) 352-5201

5 | RAFEY S. BALABANIAN*
rbalabanian@edelson.com
6 | BENJAMIN H. RICHMAN*
brichman@edelson.com
7 | CHANDLER R. GIVENS*
cgivens@edelson.com
8 | DAVID I. MINDELL*
dmindell@edelson.com
9 | EDELSON LLC
350 North LaSalle, Suite 1300
10 | Chicago, Illinois 60654
Telephone: (312) 589-6370
11 | Facsimile: (312) 589-6378

12 | *Pro hac vice admission to be sought.

13 | Attorneys for Plaintiff and the Putative Class

**Filed**

MAY 0 2 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

Fee paid
SI  (99)

14 | ## IN THE UNITED STATES DISTRICT COURT

15 | ## FOR THE NORTHERN DISTRICT OF CALIFORNIA

16 | ## SAN JOSE DIVISION

17 | DOROTHY BURCHFIELD, individually and on behalf of all others similarly situated,

18 | 

19 | Plaintiff,

20 | v.

21 | COREL CORPORATION, a Canadian company, COREL, INC., a Delaware corporation, and

22 | WINZIP COMPUTING, S.L., a Spanish company,

23 | Defendants.

Case No. CV13-02025 HRL

**COMPLAINT FOR:**

1. **Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.;**
2. **Fraudulent Inducement;**
3. **Breach of Contract; and**
4. **Breach of the Implied Covenant of Good Faith and Fair Dealing.**

**DEMAND FOR JURY TRIAL**

**CLASS ACTION**

24 |
25 |
26 |
27 |
28 |

CLASS ACTION COMPLAINT

1  Plaintiff Dorothy Burchfield ("Plaintiff") brings this Class Action Complaint ("Complaint")

2  against Defendants Corel Corporation, Corel, Inc., and WinZip Computing, S.L., (collectively

3  "Corel" or "Defendants") seeking relief for injuries that Corel caused to her and a putative class of

4  similarly situated individuals through the deceptive design, marketing, and sale of their "Driver

5  Updater" software. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to

6  herself and her own acts and experiences and, as to all other matters, upon information and belief,

7  including investigation conducted by her attorneys.

8  **NATURE OF THE ACTION**

9  1.      Corel sells software that it claims will detect, update and repair outdated or broken

10  device drivers[1] on an individual's personal computer ("PC"). The disturbing truth, however, is that

11  Corel designed its software to falsely detect the presence of outdated drivers and report that they are

12  causing significant "damage" to a consumer's PC—without performing any actual analysis of the

13  computer—in order to convince users that the purchase and continued use of the software is

14  required to reverse such damage.

15  2.      Through targeted advertisements and representations contained on its websites,

16  Corel claims that Driver Updater will update and repair device drivers that cause PC problems and

17  affect hardware performance. Corel's website further asserts that the use of Driver Updater will

18  increase computer speeds and stability and result in "peak PC performance."

19  3.      Next, to convince the consumer of Driver Updater's purported utility, Corel strongly

20  encourages the user to download a trial version of the software to conduct a free "diagnostic" scan.

21  This scan supposedly detects outdated drivers that affect hardware performance and cause other PC

22  problems. Upon completion of the scan, Driver Updater presents the user with the outdated drivers

23  purportedly detected on their computer and rates them based upon their age—ranging between

24  "Old" and "Ancient." Driver Updater then provides an alarmist graphical gauge supposedly

25

26  [1]      As discussed more fully in Section III.A below, "device drivers" refer to the files and
software that facilitate communications between hardware—physical or virtual—and the
27  computer's operating system.

28

showing the "Damage Level" that the detected drivers are causing the computer, ranging from "Low" to "High." Finally, Driver Updater explains that, in order to update these drivers and reverse the damage that they are causing, the user must purchase the full version of the software.

4.      Contrary to Corel's marketing and in-software representations, however, neither the free trial version nor the full registered version of Driver Updater perform legitimate diagnostics of a consumer's device drivers, or the resultant "Damage Level" caused by them. In reality, Corel intentionally designed Driver Updater to invariably and ominously report that users' drivers are out of date and causing serious damage to their computers, without any legitimate basis for such claims.

5.      The misrepresentations described above—both through Corel's marketing and in-software graphical and textual assertions—are used to fraudulently induce consumers into purchasing and continuing to use Driver Updater.

6.      Corel is a well-known software company and the creator of products such as 'Word Perfect' used by millions of consumers throughout the world. Given that and because average consumers lack the requisite technical expertise to understand the underlying functionality of Driver Updater, they trust that Corel designed its software to honestly and accurately assess their drivers. Corel betrayed that trust, and as a result, thousands of consumers have been and continue to be, duped into buying its software.

## PARTIES

7.      Plaintiff Dorothy Burchfield is a natural person and citizen of the State of Maine.

8.      Defendant Corel Corporation is a Canadian company with its headquarters and principal place of business located at 1600 Carling Avenue, Ottawa, Ontario K1Z 8R7, Canada. Corel Corporation does business throughout the State of California, this District, and the United States.

9.      Defendant Corel, Inc. is a Delaware corporation with its headquarters and principal place of business located at 385 Ravendale Drive, Mountain View, California 94043. Corel, Inc. does business throughout the State of California, this District, and the United States.

1    10.    Defendant WinZip Computing, S.L., is a Spanish company with its U.S.

2  headquarters and principal place of business located at 11 Professional Park Road, Mansfield,

3  Connecticut, 06268. WinZip Computing, S.L. does business throughout the State of California, this

4  District, and the United States.

5                      **JURISDICTION AND VENUE**

6    11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2),

7  because (i) at least one member of the Class is a citizen of a different state than Corel, (ii) the

8  amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the

9  exceptions under that subsection apply to this action.

10    12.    This Court has personal jurisdiction over Defendants because they conduct business

11  in California and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or

12  emanated from California.

13    13.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Corel, Inc.

14  resides in this District and because the decisions resulting in the unlawful conduct alleged in this

15  Complaint originated in and emanated from this District. Venue is additionally proper because

16  Corel, Inc. maintains its headquarters and principal place of business in this District.

17                      **INTRADISTRICT ASSIGNMENT**

18    14.    Pursuant to Civil Local Rule 3-2(e), this case shall be assigned to the San Jose

19  Division.

20                        **FACTUAL BACKGROUND**

21  **I.    A Brief Overview of Corel Corporation.**

22    15.    Founded in 1985, Corel is a software company that claims to have developed

23  "award-winning products that include[] graphics, painting, photo, video and office software."[2]

24  Perhaps best known for its 'Word Perfect' software, Corel boasts that more than 100 million people

25  use its software worldwide.

26  _____

27  [2]    Corel Website, http://www.corel.com/corel/pages/index.jsp?pgid=800127 (last accessed
May 1, 2013).

28

16.     In 2006, Corel Corp. acquired WinZip Computing, a utility software company based in Mansfield, Connecticut. WinZip is generally known for its compression and encryption software, but is also affiliated with a line of utility software products—products such as Driver Updater.

**II.     Corel Markets Driver Updater as Software Capable of Fixing or Updating Device Drivers that are Causing PC Problems.**

17.     Corel heavily promotes Driver Updater through online advertisements and on its websites as software that is capable of fixing and updating Windows device drivers. For example, if a given consumer searches the World Wide Web for software to fix or update their drivers, they will likely encounter paid advertisements for Driver Updater substantially similar to those shown in the following figures:

Ads ⓘ

**Free Driver Updates**
driver-updates.winzip.com/
For **Windows** 8, 7, Vista and XP.
Free **updates** for **Drivers**. Scan now

(Figure 1.)

Ads related to **repair windows drivers** ⓘ

Free Driver Fix - For **Windows** 7, XP and Vista - winzip.com
www.winzip.com/**driver-fixer**
Fixes System **Drivers**. Scan Now.

(Figure 2.)

18.     When a consumer clicks on a Driver Updater advertisement or hyperlink and is directed to one of Corel's webpages, the individual is then presented with representations warranting that the software will detect and update or repair outdated drivers to fix PC problems and ensure hardware stability. Specifically, Corel's websites provide the following assertions:

- "Are Windows Drivers causing PC problems?"; and

- "Driver updater will scan your system and identify outdated Windows drivers. When an outdated Windows driver is found you can update the driver with a single click[.]"

19.     Corel's websites also present detailed descriptions of the software's utility and

expressly warrant that Driver Updater will perform the following beneficial functions:

- "Update outdated drivers";
- "Automatically scan[] and install[] most recent drivers";
- "Install[] genuine drivers from manufacturers";
- "Choose which drivers to fix immediately and which can wait"; and
- "[] scan your system, take stock of your existing device drivers, and evaluate which need to be updated based on each manufacturer's latest releases."

20.    Corel claims that using Driver Updater to conduct the operations above will lead to a "faster, more stable PC," and will "[e]nsure[] peak performance of installed hardware." To demonstrate Driver Updater's usefulness, Corel recommends that the user "Start with a free scan of your PC for driver errors." Unfortunately, Corel's free trial version of Driver Updater is simply a vehicle to defraud consumers into purchasing the full version of the software—neither of which provide the level of utility represented by Corel above.

**A.    To induce consumers into purchasing the full version of the software, Corel designed the free trial version of Driver Updater to report that the PC's drivers are outdated and causing damage to the user's computer.**

21.    Upon downloading, installing, and running the free trial version of Driver Updater for the first time, the screen displayed in Figure 3 below is presented to the user, which includes a button to "Start Scan Now" and text explaining that "[] Driver Updater instantly updates and installs latest versions of all of the drivers that are on your system. Outdated drivers can reduce the overall performance of the system, especially for system critical hardware."



(Figure 3.)

22. Clicking on the "Start Scan Now" button shown in Figure 3 above initiates Driver Updater's device drivers "diagnostic" scan. Figure 4 below shows the scanning process, which contains language that reads, "[] Driver Updater is scanning all of the devices listed below for out of date drivers& .[]Driver Updater scans through all the existing drivers on system."



(Figure 4.)

1    23.    When the scan is completed, a report is generated by Driver Updater that supposedly

2  identifies outdated drivers and displays a corresponding gauge purportedly showing the "Driver

3  Age," which ranges from "Old" to "Ancient." *See* Figure 5 (showing a screenshot of Driver

4  Updater's reporting interface detecting three drivers as 'Ancient').



(Figure 5.)

15    24.    Clicking on the "Update Selected Drivers" button shown in Figure 5 causes the

16  dialog box displayed in Figure 6 to appear on the user's screen.



(Figure 6.)

1    25.    Figure 6 above shows the registration screen displayed to users after clicking

2    "Update Selected Drivers." Language contained toward the top of the screen reads, "Outdated

3    system drivers may limit hardware functionality resulting in system failure and application crashes.

4    Register WinZip Driver Updater to update all the out dated drivers and improve system speed."

5    Below this text is a "Damage Level" gauge showing that the drivers detected as outdated are

6    causing a "High" level of damage to the system.

7    26.    Although the Driver Updater's textual and graphical representations seem quite

8    menacing—the net effect of which is to scare the user into registering the software—Section III

9    below explains how these warnings are artificially fabricated to fraudulently induce consumers into

10   purchasing the software.

11   **III.    Driver Updater Doesn't Function as Advertised and was Designed to Frighten
          Consumers into Purchasing the Software.**

12   27.    To fully understand why Driver Updater fails to perform the level of utility

13   advertised by Corel, a brief foundational introduction to how Microsoft Windows device drivers

14   work is helpful. A basic explanation of Windows device drivers follows below.

15   **A.    An introduction to Windows device drivers.**

16   28.    A computer system is organized as an integrated set of devices—including hardware

17   like a printer, mouse and other peripherals—that cooperate with one another to perform functions

18   for the user. For example, the keyboard and computer screen cooperate to display characters on the

19   screen while the user types them using the keyboard. This cooperation among hardware—physical

20   or virtual—is facilitated by software known as "device drivers," which serve as a platform for

21   various devices to interact with software in a standardized manner. Device drivers allow for

22   compatibility among software and hardware devices, regardless of the individual user's specific

23   hardware configuration. For example, the Microsoft Word software is compatible with a wide array

24   of keyboards because it only needs to communicate with the Windows keyboard "device driver,"

25   which then translates the instructions to the user's keyboard, regardless of its make or model.

26   29.    The Windows operating system organizes device drivers internally into a

27

28

CLASS ACTION COMPLAINT                    9

1    hierarchical model known as a "device tree."[3] Individual hardware devices and their corresponding

2    drivers are assigned particular branches of the device tree. Each branch correlates to an input/output

3    mechanism called a "bus" (*i.e.*, the medium by which instructions are sent to the hardware device,

4    like a keyboard), which is shared by groups of hardware devices.

5        30.    When a software application (*e.g.*, Microsoft Word) communicates with a hardware

6    device (*e.g.*, the keyboard), the digital message is delivered through an input/output request packet

7    ("IRP"). IRPs are routed through the device tree, where the messages are sorted and directed for

8    receipt by the appropriate hardware device.

9        31.    It is a common misconception that a single driver controls any particular device. The

10   truth is that because of the device tree's design, no one driver exclusively controls any piece of

11   hardware—multiple drivers work in concert to accomplish most tasks. Thus, and although Driver

12   Updater purports to detect individual device drivers for update and/or repair, it does not appear to

13   account for the relationships and interdependencies between the drivers required to perform any

14   given function. Moreover, as shown below, the criteria used by Driver Updater to determine

15   whether a driver is outdated, or is causing damage to a user's computer, are wholly arbitrary.

16       **B.    Plaintiff's expert's research shows that Driver Updater (i) doesn't perform**
          **credible analyses of device drivers, (ii) arbitrarily claims that drivers are**
17        **outdated, and (iii) falsely reports that drivers are damaging the user's**
          **computer.**
18

19       32.    Through her attorneys, Plaintiff has engaged a computer forensics expert to examine

20   Driver Updater. The expert's testing reveals that the free trial and full registered versions of Driver

21   Updater use unreliable metrics to determine the "age" of device drivers. In addition, the expert's

22   findings show that Driver Updater was designed to virtually always inform the user that device

23   drivers are outdated and causing the computer "Medium" or "High" damage. Ostensibly, these

24   representations scare the user into believing that the computer is damaged and that the purchase and

     continued use of Driver Updater is necessary to reverse such damage. Worse, research also
25

26   _____

     [3]    Mark E. Russinovich & David A. Solomon, Microsoft Windows Internals: Microsoft
27   Windows Server 2003, Windows XP, and Windows 2000 (4th ed. 2005), pp. 596-99.

28

1   demonstrates that the device drivers that Driver Updater claims are causing "damage" *do not*

2   *appreciably harm* a computer's functionality. Illustrative examples of the expert's findings follow.

3       33.     In a preliminary test, Plaintiff's expert programmed a fake device driver. This fake

4   driver cannot accept any IRP requests, and it provides no functionality whatsoever on its own.

5   Figure 7 below shows the free trial version of Driver Updater detecting this "Fake device" and

6   reporting its age as "Ancient."[4] *See* Figure 7 (showing a screenshot of Driver Updater's reporting

7   interface).



(Figure 7.)

    34.     After clicking "Update Selected Drivers," Driver Updater falsely reported that this

*fake* device driver was causing the user's computer a "High" level of damage. *See* Figure 8

(showing Driver Updater's registration screen reporting that the "Fake device" is causing the

computer "High" damage). This report categorically misrepresents the impact that a fake,

inoperative, device driver has on a computer. In reality, the fake device driver has *no* impact on the

operations of a computer system.

---

[4]     Before performing this test, the expert isolated all other device drivers so that Driver
Updater did not detect them. As shown below, however, nearly every Driver Updater user is
informed that their drivers are outdated and causing "damage" to their computer.



(Figure 8.)

35.     Moreover, it is highly misleading to use a driver's age as the primary criterion to evaluate the "Damage Level" of a computer; it is axiomatic that a properly functioning driver does not detriment a computer's operations—regardless of its age. In addition to falsely reporting the "Damage Level" of the user's computer, it does not appear that Driver Updater legitimately scans device drivers at all, as shown by the following.

36.     In another test, the expert analyzed the software's scanning process to assess Driver Updater's criteria for determining the "age" of a driver. *See* Figure 9 (showing a screenshot of Driver Updater's scanning progress interface "scanning . . . devices . . . for out of date drivers"). However, using forensics tools to examine the operations underlying this scanning procedure, the expert was able identify no evidence that IRPs were transmitted to any device drivers. Accordingly, it can reliably be inferred that Driver Updater does not actually attempt to retrieve and assess information from the device drivers themselves in determining the "Age" of the drivers.



(Figure 9.)

37.     Upon closer review of the software, the expert found that Driver Updater's method for assessing the age of a driver relies upon querying the date and version data contained within each driver's installation file (in industry parlance, an "INF" file).[5] INF files, however, cannot be relied upon to provide accurate information about a driver's age because, according to Microsoft, the date provided "specifies the date of the 'driver package'" and "must be the most recent date of any file in the driver package."[6] Because a single INF file can govern the installation of several drivers, oftentimes the driver package's date does not reflect the date of any particular driver.

38.     More fundamentally, an INF file is meant for the purpose of helping "Windows . . . to install . . . components for a device" and therefore, does not store up-to-date information about already installed drivers. In addition, the standard system-supplied Windows drivers are often updated through Microsoft updates while their INF files remain intact.

---

[5]     For completeness, Plaintiff's expert found that Driver Updater's scanning algorithm does not scan INF files directly, but rather queries the Windows registry where INF data is mirrored.

[6]     See, http://msdn.microsoft.com/en-us/library/windows/hardware/ff547394%28v=vs.85%29.aspx (last accessed March 26, 2013); see also http://msdn.microsoft.com/en-us/library/windows/hardware/ff544840%28v=vs.85%29.aspx (A driver package "consists of all the software components that you must supply in order for your device to be supported under Windows," such as drivers and INF files) (last accessed May 1, 2013).

39.     The INF files for a newly installed and updated Windows system, for example, will often report that a recent system-supplied driver is several years out-of-date. For instance, by default, Driver Updater reports that the standard Microsoft system-supplied mouse driver is "Ancient." *See* Figure 10 (showing Driver Updater's registration screen reporting the Microsoft system-supplied mouse driver as "Ancient").



(Figure 10.)

40.     As a result, Driver Updater's scanning method artificially inflates the number of drivers reported as outdated and is not a credible method for assessing a driver's age. Furthermore, whereas Driver Updater's representations claim that the software is a driver and device scanner, the software cannot be said to be either of these. As explained above, it is simply an INF scanner.

41.     Evidence that Corel's software doesn't credibly evaluate the age of drivers was confirmed by purchasing, registering, an updating "outdated" drivers using Driver Updater. In this test, Driver Updater successfully detected an Ethernet card as outdated, and then downloaded and installed a new driver—designed for an Intel PRO/1000 MT Desktop Ethernet adapter—to "update" the driver device. The expert then manually rolled back the driver's INF file's installation date to

1   one day prior (*i.e.*, the driver installed by Driver Updater itself to "update" the user's driver was

2   altered to make it appear one day older).

3       42.    A subsequent scan using Driver Updater then detected the driver and reported it as

4   "Ancient," as depicted in Figure 11 below. This finding is significant; the very same device driver

5   that Driver Updater downloaded and installed to "update" the user's device driver was reported as

6   "Ancient," although its effective date was only one day older.



16   (Figure 11.)

17       43.    Worse still, the very same driver that Driver Updater downloaded and installed onto

18   the computer was also reported as causing a "High" level of damage to the computer. *See* Figure 12

19   (showing a screenshot of Driver Updater's showing a "High" level of damage as a result of

20   detecting its own device driver).

21

22

23

24

25

26

27

28



(Figure 12.)

44.     Thus, according to Driver Updater's own detection and reporting algorithm, the presence of its *own* device driver causes "High" damage to a computer system. This result demonstrates that the software's reporting mechanism is wholly arbitrary at best, and blatantly fraudulent at worst. The effect—frightening the user into purchasing the software—is the same either way.

45.     It was also discovered by the expert that Driver Updater's "Damage Level" directly correlates with the "Oldest" driver detected by the software. As demonstrated in the following test, the detection of even one "Old" driver results in a "Damage Level" of Medium.

46.     To confirm this behavior, Driver Updater was installed on a system using the standard system-supplied mouse driver. By default, the software detected the driver as "Ancient," and the expert modified the INF file-provided date data for this driver to trigger the software to detect the driver as "Old."

47.     For this test, the expert manually altered the standard system-supplied mouse driver's INF file to make it appear more recent. Upon performing a driver scan, Driver Updater detected the mouse driver as "Old," as shown below in Figure 13.



(Figure 13.)

48.     Upon clicking on the "Update Selected Drivers" button, Driver Updater prompted the user to purchase the full registered version of the software and reported that the system's Damage Level was Medium, as shown below in Figure 14 (showing a screenshot of Driver Updater's reporting the "Old" mouse device driver causing a "Medium" Damage Level).



(Figure 14.)

49.     These results suggest that even when Driver Updater only detects a single "Old" driver (in other words, the lowest available date), the software will report that the computer's

1    "Damage" level is "Medium." It can reasonably be inferred, therefore, that the lowest possible

2    "Damage" level that a user sees will be "Medium."

3        50.    Finally, the expert investigated the metrics used by Driver Updater in determining

4    whether to characterize device drivers as "Old," "Very Old," or "Ancient." These metrics are also

5    wholly arbitrary. For example, a device driver for a mouse connected to the expert's computer was

6    characterized by Driver Updater as "Old," "Very Old," and "Ancient," respectively, when its date

7    was changed to 0 days, 84 days, and 365 days older than those suggested by Driver Updater.

8        51.    In sum, Driver Updater bases its assessment of a computer's "Damage Level" on an

9    arbitrary evaluation of unreliable data associated with device drivers. These methods both

10   artificially inflate the frequency with which the software detects outdated software and virtually

11   ensure that the user is informed that his or her computer is "damaged" using the free trial version.

12       52.    Through the deceptive scheme described above, Defendants have profited, and

13   continue to profit, by defrauding consumers into believing that their computers contain outdated

14   drivers, which are supposedly causing damage to their computers, and that the purchase of Driver

15   Updater—for $29.95—is necessary to reverse this damage. But, because Driver Updater doesn't

16   actually provide the benefits advertised, and was designed to scare consumers into purchasing the

17   software, Corel doesn't deliver on its end of the bargain.

18   **III.    Corel's Model for Marketing and Selling Driver Updater Follows the Same Pattern as
         Other Companies in the Utility Software Industry.**

19

20       53.    An examination of the utility software industry as a whole shows that Corel's

21   decisions to use the sorts of fraudulent programmatic design and marketing practices described

     herein are not unique. Indeed, the industry has utilized similar techniques in selling other similar PC

22   improvement utility software for nearly a decade. Recently, however, software developers—like

23   Corel and its competitors—have been called to account for their methods used to profit from

24   consumers unable to recognize the fraudulent technological design and methodologies underlying

25   this type of supposed performance-enhancing software.

26       54.    Indeed, numerous lawsuits have been filed against well-known competitors of Corel

27

28

CLASS ACTION COMPLAINT                         18

1   (*e.g.*, Symantec Corp. and AVG Technologies)—including several by Plaintiff's counsel here—

2   which allege similar claims related to the fraudulent design and marketing of so-called utility

3   software products. Several of those cases have resulted in class-wide settlements and industry-

4   shaping software modifications, which compel the implementation of far more transparent error

5   detection and reporting procedures.

6        55.     Rather than follow suit and make the changes necessary to ensure that its software

7   truthfully detects and repairs or updates outdated drivers, Corel continues to use its unlawful

8   business practices to turn a profit.

9   **IV.    Plaintiff Burchfield's Experience Encountering, Downloading, and Purchasing Driver**

10          **Updater.**

11        56.     In or around February 2013, Burchfield's computer began malfunctioning. She

12   noticed that her computer would often hang, or "freeze," when opening programs, it would

13   frequently display system warnings and errors, and that its speed and performance had decreased

14   significantly. As a result, Burchfield performed an Internet search for software to fix her computer.

15        57.     One of Burchfield's Google searches resulted in the display of a sponsored

16   advertisement for Driver Updater—an ad substantially similar to those depicted in Figures 1–2.

17        58.     After clicking on the Driver Updater advertisement, Burchfield was directed to

18   Corel's website (www.winzip.com) and viewed its express warranties about the software's utility,

19   which were the same as, or substantially similar to, the representations contained in Paragraphs 19–

20   20, and those shown below in Figures 15–17.



**Are Windows Drivers causing PC problems?**

WinZip® Driver Updater has an extensive database of the latest and most up-to-date drivers for software and hardware devices. Driver updater will scan your system and identify outdated Windows drivers. When an outdated Windows driver is found you can **update the driver with a single click** as well as:

✓ **Update outdated drivers**
✓ Backup and restore your drivers
✓ Driver exclusion list for drivers that are already up to date
✓ Scheduled driver scans to **ensure your PC is always up-to-date**
✓ Full compatibility with all of the latest operating systems and devices
✓ Developed by a Microsoft® gold certified partner

**Free Download** 🔽

(Figure 15.)

Developed by a Microsoft®
gold certified partner

- Start with a free scan of your PC for driver errors
- Review out-of-date drivers and recommended updates
- Choose which drivers to fix immediately and which can wait
- Enjoy a faster, more stable PC

**Update my drivers - Download Now**

(Figure 16.)

Key Features:

- Ensures peak performance of installed hardware
- Installs genuine drivers from manufacturers
- Quick and easy to use
- Automatically scans and installs most recent drivers
- 32 and 64 bit operating system support
- Compatible with Windows XP, Vista and Windows 7

(Figure 17.)

59.     Relying upon Corel's representations—namely, that Driver Updater would "[e]nsure[] peak performance of installed hardware," and otherwise perform the tasks contained in Paragraphs 19–20 and depicted in Figures 15–17— Burchfield downloaded the software.

60.     After installing the trial version of Driver Updater, Burchfield performed a free scan of her computer. Burchfield recalls that, upon completion of the scan, Driver Updater reported that numerous of her computer's device drivers were "Ancient," similar to the screen shown in Figure 5.

61.     Upon clicking the "Update Selected Drivers" button, a screen was displayed on Burchfield's computer informing her that the outdated drivers detected by Driver Updater were causing her computer a "Damage Level" of "High," as visually represented through a gauge substantially similar to the one shown in Figure 6. The display screen also recommended that Burchfield "Register Now" for the full version of Driver Updater to reverse the damage caused by her supposedly outdated drivers.

62.     Relying upon all of Corel's online representations about the software's capabilities and the condition of her computer reported by the software and thus, reasonably believing that Driver Updater's analysis was accurate and that purchase of the registered version of the software was necessary to reverse the damaged caused by her outdated device drivers, Burchfield paid approximately $29.95 to activate the full version of Driver Updater.

63.     In reality, and as discussed above, Driver Updater did not actually detect "Ancient" drivers causing "Serious" damage to her computer—because the software arbitrarily assesses the age of device drivers, and doesn't actually evaluate the "Damage" caused by those drivers. In actuality, because Corel designed Driver Updater to *invariably* report that outdated device drivers are damaging the computer, the software didn't accurately identify and report the *actual* condition of Burchfield's computer. As such, Burchfield was misled into believing that her computer was damaged and that purchase of Driver Updater was necessary to repair it.

64.     Similarly, the full version of the Driver Updater software that Burchfield purchased could not and did not perform as advertised by Corel. Primarily, as discussed in Section III, Driver Updater does not actually "evaluate which [drivers] need to be updated based on each manufacturer's latest releases." As such, Burchfield's device drivers weren't properly assessed, nor updated. In fact, even after Burchfield purchased the registered version of Driver Updater and "Updated" or "fixed" the device drivers the software reported as causing her computer damage, she continued to experience the same problems described in Paragraph 56.

### CLASS ALLEGATIONS

65.     **Class Definition**: Plaintiff Burchfield brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of herself and a class of similarly situated individuals, defined as follows:

> All individuals and entities in the United States and its territories that have purchased Driver Updater.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge

1    to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons

2    who execute and file a timely request for exclusion, (4) persons whose claims in this matter have

3    been finally adjudicated on the merits or otherwise released, and (5) the legal representatives,

4    successors, or assigns of any such excluded person.

5       66.    **Numerosity**: The exact number of members of the Class is unknown to Plaintiff at

6    this time, but on information and belief, Corel has sold its software to thousands of Class members

7    throughout the country, making joinder of each individual member impracticable. Ultimately,

8    members of the Class will be easily identified through Corel's records.

9       67.    **Commonality and Predominance**: Common questions of law and fact exist as to all

10    members of the Class and predominate over any questions affecting only individual members,

11    including:

12            a)     whether Defendants intentionally designed the Driver Updater to deceive

13                   consumers into purchasing the software;

14            b)     whether Defendants' conduct described herein constitutes a violation of

15                   California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et*

16                   *seq.*);

17            c)     whether Defendants' conduct described herein constitutes fraudulent

18                   inducement;

19            d)     whether Defendants' conduct described herein constitutes a breach of

20                   contract; and

21            e)     whether Defendants' conduct described herein constitutes a breach of the

22                   implied covenant of good faith and fair dealing.

23       68.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the

24    Class. Plaintiff and the Class sustained damages as a result of Corel's uniform wrongful conduct

25    during transactions with Plaintiff and the Class. Plaintiff's claims are typical of the claims of all of

26    the other members of the Class.

27

28

1        69.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect

2 the interests of the Class, and she has retained counsel competent and experienced in complex

3 litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Corel

4 has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously

5 prosecuting this action on behalf of the members of the Class, and they have the financial resources

6 to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members

7 of the Class.

8        70.    **Policies Generally Applicable to the Class**: This class action is also appropriate for

9 certification because Corel has acted or refused to act on grounds generally applicable to the Class,

10 thereby requiring the Court's imposition of uniform relief to ensure compatible standards of

11 conduct toward the members of the Class and making final injunctive relief appropriate with respect

12 to the Class as a whole. Corel's policies challenged herein apply and affect the members of the

13 Class uniformly and Plaintiff's challenge of these policies hinges on Corel's conduct with respect to

14 the Class as a whole, not on facts or law applicable only to Plaintiff.

15        71.    **Superiority**: This class action is appropriate for certification because class

16 proceedings are superior to all other available methods for the fair and efficient adjudication of this

17 controversy and joinder of all members of the Class is impracticable. The damages suffered by the

18 individual members of the Class will likely be small relative to the burden and expense of

19 individual prosecution of the complex litigation necessitated by Corel's wrongful conduct. Thus, it

20 would be virtually impossible for the individual members of the Class to obtain effective relief from

21 Corel's misconduct. Even if members of the Class could sustain such individual litigation, it would

22 not be preferable to a class action because individual litigation would increase the delay and

23 expense to all parties due to the complex legal and factual controversies presented in this

24 Complaint. By contrast, a class action presents far fewer management difficulties and provides the

25 benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

26 Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

27

28

72.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff and the Class)**

73.     Plaintiff incorporates the foregoing allegations as if fully alleged herein.

74.     California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

75.     The UCL prohibits any unlawful, unfair, or fraudulent business act or practice. A business practice need only meet one of the three criteria to be considered unfair competition.

76.     The utility of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the utility of a product is materially misleading.

77.     As described herein, Corel engaged in fraudulent, unfair, and unlawful business practices, as defined by the UCL, by, *inter alia*: (i) publicly misrepresenting Driver Updater's functionality, including through assertions such as those contained in Paragraphs 19–20 and otherwise described in Section II; (ii) misrepresenting the results of Driver Updater's analysis reported to consumers through the free trial and full registered versions of the software as described in Section III, (iii) using its misrepresentations to induce consumers into purchasing a full registered version of Driver Updater, and (iv) selling a full version of the software that lacked the advertised utility, produced false damage reports, and otherwise was incapable of functioning as Defendants represented it would.

78.     Specifically, Defendants affirmatively represented to Plaintiff and the Class that: Driver Updater would perform a legitimate diagnostics scan of their computers to detect outdated or malfunctioning device drivers, update or repair these drivers with the latest manufacturer releases, and otherwise perform tasks such as those depicted in contained in Paragraphs 19-20 and otherwise

1   described in Section II. Further, through Driver Updater's in-software representations Corel

2   affirmatively represented that outdated drivers were causing serious damage to Plaintiff and the

3   Class's computer systems.

4         79.    Corel's representations were, in fact, false. Driver Updater does not (and cannot)

5   actually perform all of the benefits Defendants promise through its marketing materials and in-

6   software representations. Likewise, Driver Updater's scan results were false, because the software

7   did not perform any meaningful evaluation of Plaintiff's and the Class's drivers, or resultant

8   "damage" from those drivers, as explained in Section III.

9         80.    Furthermore, the *only reason* for consumers to purchase Driver Updater is to update

10   or repair device drivers that are causing PC problems. As such, the Driver Updater free trial scan's

11   false results and its failure to provide all of the utility advertised were deceptive marketing practices

12   and were likely to mislead consumers acting reasonably under the circumstances.

13         81.    Corel has violated the UCL's "fraudulent" prong by knowingly making false

14   representations of consumers'—including Plaintiff and the Class—computer's need for repair, with

15   the specific intent to defraud as many consumers as possible into purchasing and continuing to use

16   Driver Updater.

17         82.    Reasonable consumers are likely to be, and Plaintiff and the Class were, deceived by

18   Corel's misrepresentations about the full scope of benefits Driver Updater offers.

19         83.    Reasonable consumers are also likely to be, and Plaintiff and the Class were,

20   deceived by Corel's misrepresentations regarding the age of their device drivers, and the "Damage

21   Level" afflicted by those drivers. In sum, reasonable consumers were likely to be, and Plaintiff and

22   the Class were, deceived into purchasing Driver Updater as a result of their reliance upon Corel's

23   misrepresentations.

24         84.    Corel also violated the UCL's "unfair" prong by causing substantial injury to

25   consumers through its fraudulent conduct described above. The injuries caused by Corel's unfair

26   conduct are not outweighed by any countervailing benefits to consumers or competition, and the

27

28

injury is one that consumers themselves could not reasonably have avoided. Given the information asymmetry between Corel and consumers regarding Driver Updater's functionality, Corel knew or had reason to know that Plaintiff and the Class could not reasonably have known of or discovered the falsity of Corel's representations or avoided the harm those misrepresentations caused.

85.   Corel's fraudulent and unfair conduct occurred during the marketing and sale of software products, and therefore occurred in the course of Defendants' business practices.

86.   Corel's fraudulent and unfair conduct directly and proximately caused Plaintiff and the Class actual monetary damages in the form of the difference between the purchase price they paid for Driver Updater (typically $29.95) and its true value given its actual utility. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (1) requiring Defendants to cease the unfair and unlawful practices described herein and (2) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

## SECOND CAUSE OF ACTION
### Fraudulent Inducement
### (On Behalf of Plaintiff and the Class)

87.   Plaintiff incorporates the foregoing allegations as if fully alleged herein.

88.   As depicted in Figures 1–2, Paragraphs 19–20, and throughout all Counts of this Complaint, Corel has used, and continues to use, marketing tactics it knows or reasonably should know are false and misleading.

89.   To induce Plaintiff and the Class into purchasing Driver Updater, Corel affirmatively represented to Plaintiff and the Class that Driver Updater provides a certain level of utility. Specifically, Corel represented that Driver Updater would legitimately assess Plaintiff's and the Class's computers' device drivers to determine whether they were outdated or broken, as described above in Section II. Further, through screens displayed in Driver Updater itself, Corel affirmatively represented that Plaintiff's and the Class's computers were "damaged" by outdated drivers.

90.   Corel's affirmative representations were, in fact, false. In particular, Driver Updater fails to perform any credible assessment of the status of a PC's device drivers, and does not actually

1    evaluate the "Damage Level" caused by drivers.

2        91.    The utility of a consumer product is a material term of any transaction because it

3    directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any

4    deception or fraud related to the utility of a product is materially misleading.

5        92.    As Driver Updater's developer, Corel knew that its representations about Driver

6    Updater's utility were false. Corel intentionally designed its public representations to mislead

7    consumers about Driver Updater's utility, and programmed the software to falsely report device

8    drivers as outdated and to deceive users about the "Damage Level" caused to their computers.

9        93.    Corel intentionally made its misrepresentations to induce Plaintiff and the Class to

10   rely on them by purchasing, and continuing to use, Driver Updater.

11       94.    Average consumers lack the requisite technical expertise to independently gauge

12   Driver Updater's underlying functionality, and thus take Corel's statements regarding its utility at

13   face value. Plaintiff and the Class justifiably relied upon Corel's misrepresentations by purchasing

14   Driver Updater. They would not have purchased Driver Updater but for its misrepresentations that

15   their device drivers were severely outdated and causing damage to their computers.

16       95.    By using false and fraudulent marketing tactics and exaggerated and fraudulent in-

17   software representations, Corel has engaged in fraudulent practices designed to mislead and deceive

18   consumers into purchasing, and continuing to use, Driver Updater.

19       96.    As a result of their reasonable reliance on Corel misrepresentations, Plaintiff and the

20   Class have been damaged in the amount of the difference between the purchase price they paid for

21   Driver Updater (typically $29.95) and its true value, as reflected by the software's actual utility.

22       97.    Plaintiff therefore prays for relief in the amount of the difference between the

23   purchase price she and the Class paid for Driver Updater and its actual value. Plaintiff further

24   alleges that Corel's conduct and misrepresentations were made with malice and in conscious

25   disregard for Plaintiff's and the Class's rights, thereby entitling them to punitive damages against

26   Corel in an amount sufficient to deter such conduct in the future.

27

28

### THIRD CAUSE OF ACTION
### Breach of Contract
### (On Behalf of Plaintiff and the Class)

98.    Plaintiff incorporates the foregoing allegations as if fully alleged herein.

99.    Plaintiff and the members of the Class entered into agreements with Corel whereby Corel agreed to sell, and Plaintiff and the members of the Class agreed to purchase, the full version of Driver Updater that would detect, update, and repair outdated or malfunctioning device drivers using the latest manufacturer releases, as described in Section II. Based on the foregoing offer and representations, Plaintiff and the Class agreed to purchase Driver Updater.

100.    Plaintiff and the Class paid, and Corel accepted, Driver Updater's purchase price (typically $29.95), and therefore performed their obligations under the contracts.

101.    As such, Corel voluntarily assumed a contractual obligation to provide Plaintiff and the Class with software that would perform the benefits contained in Paragraphs 19–20, and as otherwise described in Section II, and that it would honestly assess and update/repair outdated or malfunctioning device drivers.

102.    Corel breached its contracts with Plaintiff and the Class by intentionally designing the full version of Driver Updater to mischaracterize and misrepresent the age of device drivers and further by failing to provide software that performed the tasks contained in Paragraphs 19–20, and otherwise described in Section II. These obligations were material terms of the agreement.

103.    Corel did not honor these obligations, as Driver Updater did not credibly assess Plaintiff and the Class's device drivers, nor did it rely upon industry standard practices to acquire updates for these drivers. That is, Driver Updater did not actually perform the beneficial tasks that it represented it would.

104.    The aforementioned breaches of contract have directly and proximately caused Plaintiff and the Class economic injury and other damages, including in the form of the purchase price (or at least a portion thereof) of Driver Updater, because they purchased a product that does not perform as Corel promised, and therefore lacks the utility contracted for.

**FOURTH CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

105.    Plaintiff incorporates the foregoing allegations as if fully alleged herein.

106.    To obtain its software's benefits as promised by Corel, Plaintiff and the Class affirmatively allowed Corel to install Driver Updater on their computers.

107.    Corel's agreement to install software designed to accurately assess the date and state of device drivers on Plaintiff's and the Class's computers and subsequently update or fix these drivers—as described in Paragraphs 19–20 and Section II—in exchange for a fee is a valid and enforceable contract between Plaintiff and the Class on the one hand, and Corel on the other.

108.    These obligations were material terms of the agreement, and Plaintiff and the Class upheld their end of the bargain. Corel failed to honor its obligations.

109.    Corel acted in bad faith and breached the provisions of the agreement, specifically by not honoring its responsibilities to perform truthful diagnostic and remedial operations, as described herein, and instead, providing software that it intentionally designed to produce false device driver and damage reports.

110.    California contract law recognizes the implied covenant of good faith and fair dealing in every contract.

111.    Implicit in the contract were provisions prohibiting Corel from engaging in conduct that frustrated or injured Plaintiff's and the Class's rights to receive the benefits of the agreement.

112.    Furthermore, Corel was under an implicit obligation to comply with the UCL, to be truthful in its advertisements, and to accurately disclose the functionality and utility of its software. Corel did not honor any of these obligations.

113.    Corel breached the implied covenant of good faith and fair dealing by failing to (i) provide software that performs the benefits depicted in contained in Paragraphs 19–20, and otherwise described in Section II, (ii) honestly and accurately detect and report outdated or damaged drivers, and (iii) fully comply with the proscriptions of applicable statutory law.

114.    Corel's misconduct and breach of the implied covenant of good faith and fair dealing

1  as described herein resulted in damages to Plaintiff and the Class in the amount of the difference

2  between the purchase price they paid for Driver Updater (typically $29.95) and its true value, as

3  reflected by the software's actual utility, which Corel knowingly and wrongfully retained.

4  **PRAYER FOR RELIEF**

5      WHEREFORE, Plaintiff Dorothy Burchfield, on behalf of herself and the Class, respectfully

6  requests that this Court enter an order:

7      A.    Certifying this case as a class action on behalf of the Class defined above, appointing

8  Dorothy Burchfield as class representative, and appointing her counsel as class counsel;

9      B.    Declaring that Corel's actions, as set out above, violate California's Unfair

10 Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), and constitute fraudulent inducement,

11 breach of contract, and breach of the implied covenant of good faith and fair dealing;

12     C.    Awarding damages, including statutory and punitive damages where applicable, to

13 Plaintiff and the Class in an amount to be determined at trial;

14     D.    Awarding injunctive and other equitable relief as is necessary to protect the interests

15 of the Class, including, *inter alia*: an order (i) prohibiting Corel from engaging in the wrongful and

16 unlawful acts described herein; (ii) requiring Corel to disclose and admit the wrongful and unlawful

17 acts described herein; and (iii) requiring Corel to fully disclose the true nature of its software

18 products now and in the future;

19     E.    Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys'

20 fees;

21     F.    Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

22 allowable;

23     G.    Awarding such other injunctive and declaratory relief as is necessary to protect the

24 interests of Plaintiff and the Class; and

25     H.    Awarding such other and further relief as the Court deems reasonable and just.

26

27

28

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

**DOROTHY BURCHFIELD**, individually and on behalf of all others similarly situated,

Dated: May 2, 2013                      By: _____
                                              One of Plaintiff's Attorneys

RAFEY S. BALABANIAN*
rbalabanian@edelson.com
BENJAMIN H. RICHMAN*
brichman@edelson.com
CHANDLER R. GIVENS*
cgivens@edelson.com
DAVID I. MINDELL*
dmindell@edelson.com
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

SEAN P. REIS (SBN 184044)
sreis@reisfirm.com
THE REIS LAW FIRM, A.P.C.
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (714) 352-5200
Facsimile: (714) 352-5201

*Pro hac vice admission to be sought.

*Attorneys for Plaintiff and the Putative Class*